May it please the court. My name is Jeffrey Dickerson. I'm counsel for the appellant from Reno, Nevada. This is a civil rights case. We're on appeal on a retaliation claim under Title VII. And we're also on appeal on a denial of a Section 1983 First Amendment claim. Counsel, this is a troubling case because it's the clearest possible quid pro quo sexual harassment if Lux is telling the truth. Boss says I want you to have sex with me. Employee refuses. Boss all of a sudden turns hostile to the employee and the employee's career is ruined. Just clear as can be. However, I have two problems. One is I can't find stuff in the excerpts. His declaration mostly doesn't declare much. It mostly incorporates hundreds of pages of other documents. And I don't even know where to look. And the other thing is, is I understand that part of the case was submitted to a jury and they found in favor of the state of Nevada. I would appreciate it if you would address those two problems I have. Show me what to find and why the jury verdict is not a sufficient reason for the decision that was made. Thank you, Your Honor. With respect to the excerpts of record, we believe that in terms of creating a genuine issue of material fact on the adverse actions, both in terms of whether they occurred, whether they can be construed as adverse actions, either singularly or collectively, and whether the reasons for those adverse actions are legitimate or not, is put forth in two primary places. And that is in the plaintiff's deposition and in his declaration. Okay, let's go with some page numbers. So we can follow you when you talk. Your Honor, the declaration of plaintiff that you referred to starts at ER 141. And in this document, the plaintiff and I worked together to attempt to address and explain what each adverse action was after the rebuff, the final rebuff, I call it. In other words, in December of 2001, in the district court, just to go take a side path here for a second, the district court, in its retaliation holding, found that there was no protected activity. In December of 2001. But in his declaration, he points out that there was. Could you be concrete? Instead of legal words like protected activity, be concrete about who did what to whom? He says in December of 2001. Where are you? This is ER 142, line 16. Okay. In December of 2001, I made it clear to Ms. Mayer that I would never leave my wife. Her advances and talk of a sexual nature stopped. Her pressing me to leave my wife stopped. In other words, we have, in the description of the sexual harassment era that preceded this, there's evidence in his deposition testimony here, and this isn't responsive to your question, but I'm just, since we're at his declaration, and since the district court found that there was no protected activity until his report in August of 2003, I want to make clear to the court that we have established in the record that there was protected activity. There are a couple sub-issues here. One is, did she ask him for sex and make the physical touchings or not? And she says she didn't. He says she did. He's under oath. That's enough to defeat summary judgment on whether she did. The next is whether they fired him because he wouldn't submit to sex or whether they fired him because of his absenteeism and tardyism. Excuse me, he wasn't fired, right? He voluntarily quit? He resigned. We're alleging that's a constructive discharge. You're alleging constructive discharge. I'm sorry I misspoke on that. But in the legal sense, it is. Let's suppose that he was fired. Let's suppose it's a constructive discharge. The question is, is it absenteeism and tardyism, or is it because he won't submit to sex? Where's the evidence on that? Well, the evidence on that, Your Honor, is the, as he pointed out in his email to her, which is attached as an exhibit to the ER, days after the change in attitude by her following the December rebuff. Hold on, there's a lot of stuff attached. There is. It's true. Maybe you could give a page number? Yes. The district judge couldn't find any of it. I think that's a lot of why Luke's lost. Well, with all due respect, Your Honor, the affidavit walks you through the documents that are attached, is my view of it. I apologize if that's not the case. That was the intent in preparing that detailed declaration was to guide the district court through all of the documentation and referring to the specific exhibits that, if you look at ER 272 as an example, Your Honor. And this is an email from Tom Lux to Madeline Mayer with a question. For the last two months or so, I've been excluded from meetings and have had the programmers reassigned. I've asked you what's going on, and you've indicated that you need me for special projects, but yet you've never given me any duties or special projects. That's in April. There's a January email. Court's indulgence. Well, there's a January, I believe it's a January 30th email, where he says that there's been a, he senses a change in attitude. He'd like to sit down with her and discuss it. She emails back at the top of that chain of email, two emails, that she has some issues to discuss, but she needs to get his work duties lined out before they sit down and talk about it. This doesn't really address the absenteeism and tardyism that the State claims is the reason why he was fired. I'm looking for stuff to show that he wasn't really absent or tardy so much, or other people who were absent and tardy just as much did not get subjected to this exclusion, so that we can draw the inference that the only reason his absence and tardiness was treated that way was because he wouldn't submit to sex. Begins with, the explanation for this begins at ER 143, line 25, where he's talking about Exhibit O in a memorandum dated January 17th from Ms. Mayer to me regarding my use of sick leave and posing a requirement of a doctor's excuse for any sick leave. Well, that was after he had made some rather dubious excuses about some of his absences, and they had some reason to want further proof, wasn't it? I'm not familiar with what absences you're talking about here. The only absences in this record happen from that point forward in time through the April and May period. There's evidence in his declaration where he points out his rebuttals to each of the critiques of what he did on a particular occasion. He's got an explanation for every absence that she called him on, and noteworthy is the fact that she didn't discipline him during this time frame. Two of the letters, two of the e-mails that are in the April time frame, she had a note on it about no prior approval, but he testified and declares in his declaration that he never saw that no prior approval writing back in time. He only saw it for the first time in litigation. I'm giving you examples of how he goes through. If you carefully read his declaration and have the patience to look. Well, it isn't really an appellate court's job to look for the needle in the haystack. It's up to the lawyer to point out where in the haystack the needle is. Well, Your Honor, with all due respect, I endeavored to do that in my opening brief, and this is candidly why I did not do a reply brief, because I felt that in this ---- Let me ask you another question about the ---- I don't want to nitpick your brief, but the ---- what exactly was the issue that was decided by the jury in that phase of the case? Now you're asking me to go outside the record, but I will, Your Honor. Well, we need to know what was left. What was left was? In the order that ---- if this is an appealable order, what was left. Although it is part of the record in this case, isn't it? Wasn't the jury trial part of this case? I ---- this record on appeal is we're not appealing the jury verdict or the judgment on the verdict. We need to know what was decided by the jury because it may have some impact on what's left for us to decide on the summary judgment question. You have a summary judgment block when you have a he said, she said transaction. So that usually has to be decided by some kind of a fact finder. That fact has not been found by the jury, apparently. So we'll say that there was a he said, she said issue surviving about the hospital work environment. But we don't know what the jury found was the cause of his termination, if that was. What did he sue about? The jury trial was about phase one. We're here about phase two. Wait. Just to clarify, I mean, this is an appeal of a final judgment. It is. The final judgment is the summary adjudication plus the jury verdict. Otherwise, we wouldn't have a final decision, which would be a subject of appeal without some certification. So this is the whole case is before us. Your opening brief is only addressing the summary adjudication piece. So the hospital work environment is something that we do need to understand. That is properly part of the record. Do you disagree with that? Not at all. Okay. So could you go ahead and then explain what the hospital work environment determination by the jury was? The defense verdict. And so the jury determined there was no hospital work environment. I think that's based on the jury instructions. That would be the conclusion I would reach. Why isn't that the end of it? I mean, it looks like if the jury believed him, they'd have to find in his favor.  True. But why shouldn't we just take this as the end of it? Because what the district court did was precluded us from pursuing as a claim the conduct that occurred after December of 2001 into the end of 2002 when he alleges he was constructively discharged. It's a different time period? Yes. Oh. I didn't know that. It is. Let me explain. But if there was no hospital work environment, then it's a little bit difficult to understand how your retaliation claim. But before what would take place in that second period, but as you're answering Judge Kleinfeld's question, could you also address the Supreme Court decision in Burlington which indicates the continuum between a quid pro quo and a hospital work environment claim and says quid pro quo claim has to have a threat that's carried out. If there's no threat that's carried out of some significant adverse employment action, then you have to look at a hospital work environment claim, which as we know has already been resolved. May I proceed? Okay. Addressing first the issue of the jury verdict and what impact that has on this case, the test under the opposition and participation clause under 2000E-3, if you will, of Title 42, the test under the opposition clause is whether or not the plaintiff had a reasonable perception of discrimination. So the fact that the jury found against him on the actual claim doesn't preclude a subsequent jury from determining that he had a reasonable perception, although mistaken. Secondly, as to the Burlington Northern case and how that impacts the analysis with respect to quid pro quo, I agree with you, Your Honor, that that case did require a tangible employment action to occur in order for the quid pro quo theory to be completed, if you will. In this case we're alleging that the constructive discharge was a tangible adverse action. We also allege that in two points in April and May she docked him some pay for being AWOL and that there was no justification for that. Those would be the two tangible adverse actions. And then our theory, however, is retaliation under Title VII. Did he engage in protected activity? Yes. Did he suffer an adverse employment action? And if so, what was that? The adverse employment action we're alleging in this case is a hostile working environment. You said there are different time periods. Yes. And as I said, I found the excerpts difficult to use, so I missed it. Tell me what the time period covered by the jury trial was. Use years as well as months. And what the time period covered by the summary judgment was. July of 2000 through December of 2001 was the era covered by the jury verdict. I may be off by a few months on the beginning of that, but I think I'm correct. Summary judgment? No, that was jury verdict. Yes, I'm asking you, what's the time period for the summary judgment? From December of 2001 to December of 2002. So in December 2001, I believe your statement was that sexual harassment stopped at that time. That's when your client made clear that he wasn't going to leave his wife. Is that correct? Yes. And then he alleges that after that, he received reprimands and et cetera. Right. So your claim of hostile work environment is not a claim based on sexual harassment, because that stopped in December 2001. It's based on these actions which he's alleging were retaliation for telling her he wasn't going to leave his wife. Is that correct? Yes, which the district judge agreed that had there been protected activity in December of 2001, there would have been adverse actions. He specifically stated that in his last order. The jury determined there wasn't a sexual harassment that rose to the level of a hostile work environment before December 2001. Is that the impact of the jury verdict? That's the impact, but we still have the reasonable perception issue, Your Honor. My time is up. You can stick around and answer a couple questions as long as we have them. I'm glad to. I looked at the jury instructions, and instruction number eight says he had to prove the following elements, and I guess this would be for 2000 and 2001, that he was subjected to sexual advances, it was unwelcome, severe and pervasive, he perceived the environment to be abusive or hostile, and a reasonable man would consider the environment to be abusive or hostile. The jury said no. How could they say no if his claim that was subjected to summary judgment is good? Factually, how could these things not be established, yet he could have a good claim that was wrongly disposed of on summary judgment? I think I understand your question, and, again, I would point out that the test under the opposition clause for retaliation isn't whether he was right or wrong. I don't understand my question. I'm not asking about legal tests. I'm not asking about theories. I'm asking about facts. And I want to know what facts could be true that would make both the verdict for the verdict period and the claim for the summary judgment period true. Whether or not the conduct in the first phase of the sexual harassment era, we'll call it, if that conduct, based upon the jury's finding, which isn't appealed, then the jury did not believe him on one of those elements or all of those elements. It was a general verdict, so we don't know. There were no special findings. It's exactly what the jury was thinking. But for oral argument purposes, we can just say, I think, they have to have thought either his boss never did come on to him or he liked it or he didn't think it was abusive or hostile at the time because he was happy with his boss coming on to him. Yes. I would agree with that. And then we move forward factually, Your Honor. We move forward into January, close temporal proximity. His duties are taken away. Much of his duties are taken away, not all of them, and given to Andrea Franco. I see. So the theory is, during the time when the boss is coming on to him, either she's not at all or it's not unwelcome, basically. No question it's pervasive if his story is true. But then after he turns her down, that's the summary judgment period and that's the woman's burned period. Exactly. Okay. And that brings us back to, is there any evidence that other people had comparable records on absenteeism or tardyism and he was treated worse than them? He points out in his affidavit to knowledge of the leave usage of others in his declaration. I mean, I said affidavit, I mean declaration. He points out in there, for instance, that Otto was allowed to take vacation during a very tough time period for getting the project in play and that when he went to, he advised his supervisor by e-mail that he was going to leave early to go see his son's track meet. And she wrote him up for that. I mean, I'm starting at the beginning and you can go through the record, Your Honor, and see that he takes apart in this declaration each one of the things that they're saying he was a bad boy for. And then this all leads through to him going to the Attorney General's office in August and complaining about this retaliatory conduct and about the sexual harassment that happened before. And then things get worse. And then he's sent home on administrative leave. And then we've got the medical evidence of his FMLA certification during this time frame and his doctor treating him during this time frame and his doctor recommending that he leave the toxic work environment. His efforts through his attorney to get some sort of a transfer going on, not me, another guy, to get a transfer. There's evidence of his. Wait a minute, let's back up to what she did. No, I guess you're way over time. I should let you go on and not take up all my colleagues' morning here. But thank you, Counsel. Even though you're over time, I think you should be prepared in case we give you 30 seconds or a minute for rebuttal. Very good, Your Honor. Thank you. Thank you. Thank you. May it please the Court, my name is Andrea Nichols. I'm the Senior Deputy Attorney General with the State of Nevada. It's my privilege to be here today representing Nevada's Division of Child and Family Services, its Department of Information Technology, and one of its employees, Madeline Mayer. Counsel, it looks like about as straightforward a case of a boss propositioning an employee sexually as there could possibly be. And even though she says it never happened, I think for the summary judgment we have to proceed on the assumption that it did. Because he says under oath it did. She says under oath it didn't. And if there's a genuine issue of fact, it has to go to trial. Well, Your Honor, I would argue that the mere scintilla of evidence. I don't see why it's not a scintilla. A man swears under oath it happened. That's not what the mere scintilla rule addresses. Well, Your Honor. Wait a minute. Let me make sure I understand your argument. Are you saying we should treat it as though it didn't happen because he doesn't have, say, an eyewitness to the sexual come-ons? No, Your Honor, because he says that it happened in plain view of everyone else. He says it happened when they went to Las Vegas with a large group of people. And we've presented the affidavits of people that were there in Las Vegas. He says that was... Let's say that we don't know what we'll do. We don't confer in advance. But let's say that we just don't buy that. We think you're just making a jury argument, and you should make it to a jury, and that you really did come on to him, like he says, at least for purposes of summary judgment decision. Let a jury decide. Let's assume that. Where do you go from there? Well, we did actually present it to a jury, and they ruled in our favor. However, we did... If I understand your opposing counsel correctly, what went to the jury was the woman's spurned period, and what went to summary judgment was the sexual come-on period. If I may proceed, Your Honor, under the case of McDonnell, I believe it's McDonnell-Douglas v. Green, decided by the U.S. Supreme Court probably 20 years ago, the burden shifts to the employer to show a legitimate nondiscriminatory reason for any adverse employment action. And then the burden goes back to the plaintiff to show that the reason was merely pretextual. In this case, Mr. Lux did not present any evidence of pretext, and he was given every opportunity to do so. What do you mean by any? He presented evidence that he was excluded from meetings that he used to be invited to join and that he was told he was needed for other things, but there were no other things, that he was disciplined in various ways for things that he hadn't been disciplined for before and that other people didn't get disciplined for. I mean, if he's believed, which is up to a jury, it's just your basic sexual advances rejected situation. Well, fortunately, during the period of time that this supposed sexual harassment was going on, Madeline Mayer was not always his boss. Mr. Lux started working on the Unity Project in, I think, July of 2000. When he first started working for the Unity Project, his boss remained, Dan Stockwell, at the Department of Information Technology. And, Your Honor, I would point you to... Are we talking about the sexual overtures period, not the woman's burn period now? Yes, Your Honor. Dan Stockwell's affidavit starts at Excerpts of Record, page 570. He started working with Mr. Lux in 1998 and had one problem after another, including Mr. Lux leaving for a week, and Dan Stockwell went to Mel Watson, Lux's direct supervisor, and said, why did you approve that leave? Well, Mel Watson and Dan Stockwell... Mel Watson reported to Dan Stockwell that he didn't approve that leave, and they both think that he forged a timesheet, and the original of that was submitted in evidence, and a copy of it is attached. And you also have corroboration at Excerpts of Record, page 600. That's the affidavit of Mel Watson. It corroborates absenteeism and tardyism. It tends to go the other way on action against them. It sounds like he'd been absent and tardy for years, but they didn't do anything about it, until he said no to his boss. Well, no, that's not true. Dan Stockwell's affidavit documents everything he did before Mr. Lux went to Unity, but then after Mr. Lux went to Unity. And if you look, I'm looking at Dan Stockwell's affidavit in Excerpts of Record, page 575. In June of 2006, Tom left early without obtaining preapproval. I sent him another e-mail explaining procedure. A copy of that e-mail is attached. And then in July, he starts at Tom, Mr. Lux starts at the Unity Project. Mr. Stockwell didn't hear anything. Was he disciplined for any of the tardyism and absenteeism? Yes, Your Honor. That's what I'm trying to get to. For a few months, Dan Stockwell, Mr. Lux's boss at Department of Information Technology, doesn't hear anything. He assumes everything's okay, but then he starts looking, and he notices nobody's ever out at the Unity Project. So in January of 2001, he starts paying attention. In January, in February, in April of 2001, he sends e-mails to Mr. Lux explaining the leave procedures to him. He sends him a written reprimand that's dated June of 2000, and then there's another one in February of 2001. This is when he's working on the Unity Project. The page number is Excerpt of Record 587, and the other page number that's actually a lot earlier is at 584. Now, Mr. Lux would have you believe that he didn't have any problems prior to working with Madeline Mayer, but that's simply not the case. He had these problems, and then he stayed at the same job, and the job was just transferred from the Department of Information Technology to the Division of Child and Family Services. And when the job was transferred to the new division, Madeline Mayer became his supervisor, and she just started documenting the same problems that he'd had when Dan Stockwell was his supervisor. So the same problems just continued through Stockwell and through Mayer. Yes, Your Honor. Now, do you have evidence that Stockwell reprimanded or disciplined him while the problems were going on and she was his boss before he told her, no, I'm sticking with my wife? Dan Stockwell would have no reason to discipline. I didn't ask you about Stockwell, unless I misspoke. I meant Mayer. Sure. Madeline Mayer's deposition starts on page 509, and she's attached disciplinary. What I want to do is see discipline or reprimand during the overtures period rather than the woman's spurns period. Those were mostly under Dan Stockwell. Supposedly he was his boss. How long was she his boss before the woman's spurns? He starts at Unity in July of 2000, and he's claiming that he was sexually harassed from July of 2000 to December of 2001. Unity, I guess everybody in the Nevada office knows what that means, but I don't, and I don't need to know. Is that when Mayer becomes his boss, July 2000? No. When does Mayer become his boss? July 2001. Yeah. Okay, Mayer becomes his boss July 2001, and I think all the sexual overtures, if he's believed, happen between July and December, and then he says, I'm sticking with my wife, and it stops. Oh, I'm sorry. I thought he testified that they started the minute he started working at Unity, that it went on for a year and a half. But I don't know either, and I don't. I have a hard time trying to make his case. What I'm really interested in is there's a period of time when Mayer is his boss, and if he's telling the truth, she's asking him for sex, and he has not decisively rejected her yet. But his absenteeism and tardyism just continues like it always has, and what I want to know is do you have evidence of reprimands or discipline during that period? Well, what happened, Your Honor, when she first became his boss in July of 2001, but she went out for surgery in September of 2001. So during this period, she's dealing with a medical condition, the details of which are not in the record on appeal, if you'd like it, but it did come out at trial. Ms. Mayer was diagnosed with they found a tumor in her breast, and so she had a radical mastectomy in September, and that's why she was out on surgery. And it's in her affidavit that right after Mr. Lux started that he started in July of 2001, she went out to have surgery in September of 2001. When did she get back? In October. Back in October. Yeah. What about October, November, December, when allegedly she's coming on to him and he doesn't give her a firm no until December? Did she reprimand him or discipline him during that three-month period? She documents, and this is her affidavit starts at excerpt of record 509. At excerpt of record 512, she's documenting in December of 2001 his leaving early without obtaining preapproval. In January, she starts. And then interestingly, you know, the discipline from her does really start, it starts in December. It continues into January of 2002. If Mr. Lux is to be believed, it increases in 2002 because this is when she was spurned. But I would like to point out before I run out of time that he would say that he was treated differently. I'd point your honor to excerpt of record at page 379. That's some testimony from the personnel person. He says that she testified that you could ask for leave with just a verbal. And he actually points us to this part of the record. When you look at that part of the record, she testifies actually that you do have to have a written preapproval. And this was applied across the board to everyone. Could I ask a kind of a dumb question, I guess? But in common law, you couldn't split a cause of action and say, yeah, I've got a beef with my employer and I'm going to sue for part of it, part of what happened up until December of 2001, and then I'll sue for what happened afterwards in another cause of action. Now, how did this case get split up into these time periods? It looks to me like a holistic case of a beef with an employer and about mostly about absenteeism and then this given that apparently this he said, she said question about sexual harassment. Well, I agree, Your Honor. There's two species of sexual harassment. There's hostile work environment and there's quid pro quo. In this case, in his complaint, Mr. Lux alleged both. He didn't allege multiple complaints, but I don't see how you split a cause of action into time periods. Well, he alleges that the quid pro quo sexual harassment of 2001, and then in January of 2002, that's when the hostile work environment started. Now, he's saying, and what's really odd about this, too, is that he's saying that her disciplining him for absenteeism and poor job performance is hostile. He doesn't, he alleges, though, at this point the sexual harassment had ended. Well, did the jury say it wasn't hostile or if it was hostile, it wasn't the causal relationship of his quitting? Yes, Your Honor. I mean, that's sub-instruction number two. That's also possible, Your Honor. Counsel, I don't understand. I'm puzzled by the same thing Judge Goodwin is. I don't understand why the whole thing didn't go to the jury. It seems like somebody's lying and breaking it up the way it was, it's kind of confusing. Because we have to assume with summary judgment against him that wherever he swore to it, he was telling the truth about what happened during the summary judgment period. Well, I think that goes to the burden shifting analysis. No, no, I don't think McDonnell Douglas has much to do with that. But Judge Hicks, who decided the motion for summary judgment, said there's no evidence of pretext. We don't have anything that would show that the disciplinary action was in any way unwarranted. That seems surprising to me. I mean, it's typical for people to get mad at people who turn them down, who reject them with regard to love or sex. Well, and Mr. Lux actually filed a motion for reconsideration of that determination, which Judge Hicks granted. And said, okay, here's your chance, show me pretext. And we get yet another order saying, I can't find any evidence of pretext. So we can't let quid pro quo go to the jury. But I guess it could have been hostile from a reasonable person's point of view, so we'll let hostile work environment go to the jury. What I interpreted the verdict, frankly, was that he hadn't really made up his mind about sticking with his wife during the overtures period and kind of liked it. That would be the easiest way for the jury to return the verdict that they did and for that to be consistent with his claims during the summary judgment period. So he fails the unwelcome element. And then after he says no, then he's got the woman's burn period, which is the summary judgment period. I think there's more to it than that, Your Honor. I think he testified that anybody with eyes would have seen this. But we have the state did an investigation. I was so unimpressed with that. I mean, the state investigation, one of the things in it was, did she arrange for them to get adjoining hotel rooms? And the state investigator just asked her and she said no, and he didn't even bother calling the hotel and asking the desk clerk whether she arranged adjoining rooms. It looked like a whitewash rather than an investigation. They interviewed 22 people who Tom Lux said witnessed this harassment. None of those people could corroborate the harassment. We submitted the affidavits of numerous, numerous coworkers with our motion for summary judgment.  Those people testified at trial that if it was... At the time, I believe by the time we had gone to trial, Madeline Mayer was no longer working. She still works for the state, but she wasn't working at the Division of Child and Family Services. She wasn't their boss. Some of them did still work on the Unity Project, but most of them had found other jobs. Diane Como, whose affidavit is at 615, was Madeline Mayer's boss. Dan Stockwell, who I mentioned before, was Mr. Lux's boss at the Department of Information Technology. We had Tabitha Creon, who went to work for the Department of Corrections. When we submitted these affidavits, probably half of these people no longer worked there, so they had no reason to stick up for their boss. Thank you, counsel. Counsel, why don't you take 30 seconds in case anything came up that needs rebuttal? That was an interesting interchange. I'm not sure where the Court desires me to hit, but a lot of it was focused on the advancement period as opposed to the subject of the summary judgment motion, which is the period beginning January of 2002 and going to the end of that year. I hope that comment just refocuses the Court on what's important here. Is there a genuine issue of material fact with respect to pretext on each of these things that we're alleging are adverse actions? We submit that we've shown that there is a genuine issue for a jury. Thank you, Your Honors. Thank you, counsel. Thank you, counsel.
judges: Goodwin, Kleinfeld, Ikuta